UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

| | | |
|---|---|---|
| TORRANCE McLEMORE, | ) | |
| | ) | |
| Petitioner, | ) | Case No. 1:03-cv-871 |
| | ) | |
| v. | ) | Honorable Richard Alan Enslen |
| | ) | |
| MARY BERGHUIS, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) | |
| _____ | ) | |

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner is serving a term of 14 to 25 years, 1½ to 20 years, 1 to 4 years, and 2 years, consecutively, imposed by the Eaton County Circuit Court on November 3, 1999. Petitioner was tried with co-defendant Jerome Taylor. A jury convicted Petitioner of assault with intent to murder, MICH. COMP. LAWS § 750.83, possession with intent to deliver less than fifty grams of cocaine, MICH. COMP. LAWS § 333.7401(2)(a)(iv), possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b, and carrying a concealed weapon, MICH. COMP. LAWS § 750.227. In his petition, filed by his attorney, Petitioner raises four grounds for relief, as follows:

I.     Petitioner was denied due process of law because there was insufficient evidence at trial to sustain verdicts of assault with intent to murder, possession with intent to deliver narcotics, and carrying a concealed weapon.

II.    Petitioner was denied due process of law when the police conducted a photographic identification procedure that was impermissibly suggestive and when the trial court admitted the identification at trial.

III.   Petitioner was deprived of effective assistance of counsel when his trial attorney stipulated to a confessed essential element of the narcotics charge.

IV.     Petitioner's sentences on two offenses were grossly disproportionate to the offenses and amount to cruel and unusual punishment.

Respondent has filed an answer to the petition (docket #27) stating that the grounds should be denied because each of them is either procedurally defaulted and/or meritless.  Upon review and applying the AEDPA standards, I find that grounds one and four are procedurally barred and are furthermore without merit; and grounds two and three are without merit.  Accordingly, I recommend that the petition be denied.

## Procedural History

### A.  Trial Court Proceedings

The state prosecution arose from a shooting that occurred on April 1, 1999 in Lansing.  Petitioner was charged with assault with intent to commit murder, possession of a firearm in the commission of a felony, possession with intent to deliver a controlled substance, and carrying a concealed weapon.  Following a preliminary examination on August 6, 1999, Petitioner was bound over on all four charges.  He was tried jointly with co-defendant Jerome Taylor before a jury beginning on September 27, 1999, and concluding on September 29, 1999.

Victim Willard Payne, 19, testified at trial on direct examination as follows.  On April 1, 1999, between 4:00 and 4:30 p.m., he was walking down Waverly Road in Lansing.  (Trial Tr. vol. I, 195, 9/27/99, docket #13.)  As he walked past the Pawn Brokers shop, he saw Petitioner and co-defendant Taylor walking toward him from the Cranbrook Apartments across the street.  (Tr. I, 198-200.)  Payne knew Taylor as "Corleone."  (Tr. I, 198-99.)  Payne and Taylor had some conflict in the past, but "nothing . . . like . . . being shot."  (Tr. I, 216-17.)  Payne did not know Petitioner except for having previously seen him with Taylor.  (Tr. I, 199-200.)  Payne and Taylor

greeted one another, then Petitioner interrupted them in a tone that sounded like he "wanted some problems." (Tr. I, 202.) Petitioner and Payne proceeded to "tussle" near the driveway of Pawn Brokers while Taylor stood off to the side. (Tr. I, 203-04.) A .45-caliber automatic gun dropped from Petitioner's waist area and Taylor picked it up off the ground. (Tr. I, 204-06.) Payne saw Petitioner get the gun back from Taylor and lift the gun up. (Tr. I, 208-10.) Payne turned away from Petitioner to avoid being shot; then Petitioner shot Payne in the right buttock/hip area. (Tr. I, 209-10.) Payne recalled only one shot being fired. (Tr. I, 210-11.) Payne fell into the grass near Pawn Brokers. (Tr. I, 211-12.) Petitioner and Taylor fled. (Tr. I, 212.) An ambulance took Payne to the hospital. (*Id*.) Payne was certain Petitioner and Taylor were the two perpetrators. (Tr. I, 217.)

Petitioner's counsel cross-examined Payne regarding his inconsistent testimony at the preliminary examination as to where the gun was pointed right before he was shot. (Tr. I, 229-32.) Payne admitted during cross-examination that when he saw the gun, he turned to run away. (Tr. I, 257.) After the jury was excused for a recess, Petitioner's counsel objected on the record to the court's ruling that she could not question Payne regarding cocaine found in his pocket after the incident to show Payne's potential bias. (Tr. I, 258-59.) The prosecutor responded that Payne received no immunity for his testimony, and the court reiterated its ruling that the cocaine found on the victim could not be explored on cross. (Tr. I, 259-60.)

Stephanie Roth, an employee at First Class Pawn Brokers, testified as follows. She was waiting on a customer at Pawn Brokers on April 1, 1999 between 4:00 and 4:30 p.m. (Tr. I, 262-63.) Roth looked out the windows because she heard arguing outside. (Tr. I, 265-66.) She saw Petitioner and Taylor arguing with a third person and heard "cussing." (Tr. I, 267-69, 272.) The third person had his fists up. (Tr. I, 272-73.) When the third person turned away, facing "sideways,"

- 3 -

Petitioner "pulled out a gun and shot him" in the leg. (Tr. I, 273, 277.) Roth saw the victim fall to the ground. (Tr. I, 277.) Roth called 9-1-1. (Tr. I, 281.) Later that day, the police asked her to look at a suspect in the Cranbrook Apartments parking lot. (Tr. I, 281.) She looked at the suspect from 20 feet away and was not able to identify him as one of the perpetrators because she was scared. (Tr. I, 281-83.) Later, at the preliminary examination, she identified Petitioner and co-defendant Taylor as the perpetrators. (Tr. I, 282-83.)

Petitioner's counsel cross-examined Roth on how she could see clearly when there was a bar on the Pawn Brokers window. (Tr. I, 279.) She further cross-examined Roth on inconsistent statements Roth gave to detectives, and inconsistent testimony she gave at the preliminary examination. (Tr. I, 294-96, 303-04, 312-13.) Roth confirmed that she was not able to identify Petitioner at the scene of the shooting. (*Id*.) She further stated that she saw Petitioner take the gun from his waist, and never saw the gun drop to the ground. (Tr. I, 292-93.)

Mario Bobbitt testified that he was working at the McDonald's on Waverly Street on April 1, 1999. (Trial Tr. vol. II, 323-24, 9/27/99, docket #14.) Between 4:00 and 4:30 p.m., he was changing the garbage inside the restaurant's front windows, and saw three guys arguing and wrestling like they were "horseplaying." (Tr. II, 325-26, 333.) Bobbitt had watched two of the guys cross the street from the Cranbrook Apartments and walk toward the third, who was walking south on Waverly. (Tr. II, 327.) Two of the guys grabbed each others' clothes, pushed each other, and began to fight while the third guy stood to the side. (Tr. II, 329, 332-33.) The person who had been standing to the side put his arm between the two who were fighting; one of the two who were fighting took a gun and shot the victim from no more than five feet away. (Tr. II, 332, 336-37.) The victim fell to the ground; Bobbitt ran out of McDonald's to check the victim's wounds. (Tr. II, 339,

- 4 -

341.)  The victim had been shot in his hip/stomach area on the side of his body.  (Tr. II, 341-42.)
Bobbitt saw the two perpetrators run to the Cranbrook Apartments.  (Tr. II, 339-40, 343-45.)  Bobbitt
ran to a pay phone, dialed 9-1-1, and reported what he had seen.  (Tr. II, 342-45.)  Bobbitt had seen
the victim before at McDonald's.  (Tr. II, 346.)

       Petitioner's counsel cross-examined Bobbitt on prior inconsistent statements he had
given in a tape-recorded statement 20 days after the incident.  (Tr. II, 351-52.)  Bobbitt stated on
cross that he was watching the incident 90% of the time; the other 10% of the time he was pushing
the garbage can out the door of McDonald's.  (Tr. II, 357.)

       Steven Freeman testified that he was at the Cranbrook Apartments between 4:00 and
4:30 p.m. on April 1, 1999.  (Tr. II, 375-76.)  He was in the parking lot standing next to his car with
his wife, his sister-in-law, and her kids when he heard a gunshot.  (Tr. II, 376-77.)  Freeman told his
sister-in-law and her kids to go to their apartment; Freeman and his wife then got into their car and
backed up.  (Tr. II, 378.)  As Freeman was driving out, two African-American men that fit the
descriptions of the perpetrators quickly ran by his car toward the Cranbrook Apartments.  (Tr. II,
378-80.)  One of them had a gun in his hand.  (Tr. II, 381.)  Freeman stopped his car and got out to
assist the victim.  (Tr. II, 382-83.)  He saw that the victim was bleeding in the hip/groin area, and left
when a bystander who said she was a nurse arrived.  (Tr. II, 383-84.)  As he drove away, Freeman
saw the same two men who'd run by his car standing near the apartments; Freeman flagged down
a police car and pointed the men out to the officers.  (Tr. II, 385-86.)

       Michigan State Trooper Chris Belt testified that he received a call regarding a
shooting on Waverly Road on April 1, 1999.  (Tr. II, 400-01.)  Belt arrived at the scene and assisted
in treating the victim, who was laying in front of Pawn Brokers Plus on Waverly Road bleeding and

- 5 -

in and out of consciousness. (Tr. II, 401-02.) The gunshot appeared to have entered in the victim's right buttock and exited from his groin area. (Tr. II, 402-03.) Belt found a spent cartridge at the scene. (Tr. II, 406-07.) Petitioner's counsel objected to the prosecution's introduction of photographs of blood-covered grass at the scene as more prejudicial than probative. (Tr. II, 403-05.) The objection was overruled. (Tr. II, 405-06.)

Petitioner's counsel cross-examined Belt on prior inconsistent statements he had made regarding the heights of the two perpetrators. (Tr. II, 391-92.)

Ellen Crawford testified that she was employed at the emergency room of the Ingham Regional Medical Center on April 1, 1999. (Tr. II, 410-11.) At around 6:00 p.m., she attended to gunshot victim Willard Payne. (Tr. II, 411.) Payne's entrance wound was in his right buttock and the exit wound was in his right thigh; he was bleeding heavily. (Tr. II, 412.) After addressing Payne's injuries, Crawford spoke with a Detective Houchlei. (*Id*.) Crawford later found out Payne's femur was fractured. (*Id*.)

The jury was excused so Petitioner's counsel could make a motion. (Tr. II, 413.) She stated that although she advised against it, Petitioner insisted that she question Crawford and/or Houchlei about the cocaine found on Payne in the hospital. (Tr. II, 413-14.) Petitioner then changed his mind, deferring to the expertise of his counsel, and asked her not to pursue that line of questioning. (Tr. II, 414-15.) As a result, Petitioner's counsel had no questions for Crawford on cross-examination. (Tr. II, 416.)

Lansing Police Officer Brian Whitsitt testified that he was dispatched to a shooting on Waverly Road sometime around 4:30 p.m. on April 1, 1999. (Tr. II, 416-17.) As Whitsitt drove toward the Cranbrook Apartments, he saw two individuals matching the description of the

perpetrators standing near apartment 3716-D.  (Tr. II, 418-20.)  When they saw Whitsitt approaching

in his car, the two men ran into the apartment building.  (Tr. II, 420-21.)  The police set up a

perimeter around the building; Whitsitt was assigned to watch the doorway.  (Tr. II, 421-22.)

       Petitioner's counsel cross-examined Whitsitt on his description of both men wearing

red, which did not match other witnesses' descriptions of them.  (Tr. II, 423-24.)  After he admitted

that he had previously described the two men as having the same height and weight, counsel asked

both defendants to stand and asked Whitsitt whether they were in fact the same height and weight;

Whitsitt responded, "no."  (Tr. II, 426.)

       Robert Hawkins testified that he was at his sister's apartment at the Cranbrook comp-

lex on April 1, 1999.  (Tr. II, 434-35.)  Between 4:30 and 5:00 p.m., Robert Hawkins (hereinafter

referred to as "Robert") was taking out the garbage and three or four Lansing Police cars pulled up

and told him to get out of the line of fire.  (Tr. II, 435, 437.)  He saw co-defendant Taylor walking

on the sidewalk toward a park.  (Tr. II, 450-51.)

       On cross-examination, Robert stated that he only saw one, not two, black men try to

enter his sister's apartment; an apparent contradiction with a prior statement to police.  (Tr. II, 447-

48.)

       Diana Michelle Hawkins testified she is Robert Hawkins's sister and was, with

Robert, visiting their other sister Marcia's Cranbrook apartment on April 1, 1999.  (Tr. II, 452-53.)

Diana Hawkins (hereinafter referred to as "Diana") further testified as follows.  From her sister's

apartment, Diana heard someone outside say, "Freeze.  You're in the line of (something)" when

Robert was taking the garbage out.  (Tr. II, 454.)  Two men she identified as defendants then ran into

the apartment where she was standing.  (Tr. II, 455-57.)  "Corleone," who Diana had identified as

co-defendant Taylor, pulled some drugs that Diana believed to be crack cocaine out of his pocket in a baggie, threw them at Diana, and told her to get rid of them.  (Tr. II, 460-61.)  The drugs fell to the ground and Diana said, "no"; she did not pick them up.  (Tr. II, 461-62.)  At that point, "Chocolate," who Diana had identified as Petitioner, picked up the drugs.  (Tr. II, 462.)  Taylor pulled a gun from his waistband and gave it to Petitioner, telling him, "go get rid of it."  (Tr. II, 462-63.)  Petitioner then ran upstairs to the second floor of the apartment.  (Tr. II, 463.)  Taylor asked Diana to walk outside with him and act like she was his girlfriend; she refused.  (Tr. II, 463-64.)  Diana then left the apartment, but a police officer outside told her to go back in to determine whether there were any kids inside.  (Tr. II, 464-65.)  When Diana re-entered the apartment, Taylor was gone, and she found Petitioner in an upstairs bedroom sweating and shaking.  (Tr. II, 466-67.)  Diana saw the drugs, but not the gun.  (Tr. II, 468.)  Diana told Petitioner to get out; Petitioner asked her to help him.  (Tr. II, 468.)  Diana left Petitioner in the apartment and went outside; and next saw Petitioner laying on the ground apprehended by the police.  (Tr. II, 469.)  She then saw the police place Petitioner in the back of a patrol car.  (Tr. II, 470.)  Later that night, when she reentered the apartment with police, Diana found two coats and a hat that had been worn by Petitioner and Taylor. (Tr. II, 470-74.)

Petitioner's counsel cross-examined Diana on inconsistent statements she'd given at the preliminary examination and to detectives.  (Tr. II, 475, 482-85, 487, 490-92, 498, 509-10.)  Petitioner's counsel also asked Diana whether Diana had visited with Tanja McQuinn, Petitioner, and Petitioner's girlfriend at McQuinn's Cranbrook apartment the night before the shooting, apparently in preparation for Petitioner's alibi defense.  (Tr. II, 497-98.)  In response, Diana stated, "No.  What the hell you talking about?" (Tr. II, 498.)

Geriecia Stitt, 15, testified that on April 1, 1999, she saw two or three black males fighting from where she was in the Waverly Road McDonald's. (Tr. II, 513-17.) She further testified as follows. The fighting stopped for a moment and one of the men pulled out a gun and shot another one from about five feet away. (Tr. II, 518-19.) Stitt was standing outside in front of the McDonald's when she saw the shooting. (Tr. II, 523-24.) The victim fell and the shooter walked to the Cranbrook Apartments. (Tr. II, 522.) Stitt had never seen any of the men before. (Tr. II, 524-25.)

Danielle Richardson, 10, testified she was with Stitt at the Waverly Road McDonald's on April 1, 1999. (Tr. II, 528-29.) She stated she saw three black males fighting in front of Pawn Brokers. (Tr. II, 531, 534.) Richardson testified she then heard, but did not see, a gunshot. (Tr. II, 533.) She stated that she ran outside and saw the victim laying in the grass; the two other men ran across the street. (Tr. II, 533-34.)

Eaton County Deputy Sheriff Timothy Fandel testified that he responded to the scene of the shooting on April 1, 1999. (Tr. II, 535-36.) He further testified that he videotaped the scene of the shooting. (Tr. II, 536.) Petitioner's counsel objected to the admission of the videotape into evidence because it was cumulative of pictures that were previously admitted. (Tr. II, 539.) Counsel's objection was overruled and the tape was played for the jury. (Tr. II, 540.)

Eaton County Deputy Sheriff Jeff Lutz testified that he, too, responded to the scene of the shooting on April 1, 1999, and processed evidence at the scene. (Tr. II, 542-43.) Lutz further testified as follows. He identified a spent .45-caliber cartridge in a photograph as the same cartridge he took from the scene and placed into an evidence envelope. (Tr. II, 544.) Lutz also identified a green sweatshirt he'd seized from under the Pawn Brokers sign and placed into an evidence bag.

(Tr. II, 546.)  Lutz testified that later on the night of the shooting, Detective Houchlei gave Lutz some items recovered from the victim at the hospital; Lutz also identified those items in the courtroom.  (Tr. II, 547.)

Eaton County Detective Daniel Preuter testified that he arrived at the scene after 4:00 p.m. on April 1, 1999 and was directed to the Cranbrook Apartment complex.  (Tr. II, 552.)  Preuter waited in the parking lot for the Lansing Police to clear the building.  (Tr. II, 554.)  He observed Petitioner, whose street name is "Chocolate," in the back of a patrol car.  (Tr. II, 555-56.)  At around 10:20 p.m., Preuter and Detective Houchlei searched the second floor of a Cranbrook apartment.  (Tr. II, 552-56.)  In the closet of a bedroom, Preuter found a .45-caliber pistol, an accompanying magazine with some .45-caliber rounds in it, a bag of white substance he believed to be crack cocaine, and a live round that appeared to have been ejected from the magazine or the gun.  (Tr. II, 557.)  Preuter identified the .45-caliber weapon, magazine, live round, and crack cocaine he had seized from the bedroom.  (Tr. II, 562-64.)

Eaton County Detective Matthew Houchlei testified that he arrived at the scene at about 5:00 p.m. on April 1, 1999.  (Tr. II, 580.)  Houchlei was directed to Ingham Hospital where the victim was being treated.  (Tr. II, 581.)  He took a brief statement from victim Payne and received items of Payne's clothing from a nurse.  (*Id.*)    He then returned to the scene of the shooting, where there were officers waiting to enter a residence in which they believed some suspects were hiding.  (Tr. II, 582-83.)  Houchlei participated in the search of the apartment and found crack cocaine, a gun, gun clip, and a .45-caliber round in the back of an upstairs bedroom closet.  (Tr. II, 583-85.)  He also seized two coats and a baseball hat from the apartment's first floor.  (Tr. II, 585-86.)

Houchlei further testified on direct examination that on April 30, 1999, he and Detective Kevin Hearld conducted a photographic lineup with victim Payne. (Tr. II, 587-88.) Houchlei had been given co-defendant Taylor's name as a possible suspect, and had Petitioner's name from contacts with him on April 1, 1999. (*Id*.) Houchlei put together the photo lineups. (Tr. II, 588-89.) Payne was read a "standard admonishment" before each of the two photo lineups was presented to him. (Tr. II, 588.) In addition, Houchlei told Payne they had a separate Xerox copy of the photographs, and that Payne should circle and initial on the Xerox copy who he was identifying. (Tr. II, 589-90.) Payne circled Taylor in one of the photo lineups and Petitioner in the other. (Tr. II, 590-91.)

Petitioner's counsel objected to the lineups as unreasonably suggestive because the photo of Petitioner was a different color than those of the others. (Tr. II, 592-93.) The court ruled that the objection went to the lineups' weight, not their admissibility, and admitted them. (Tr. II, 593-94.) On cross-examination by Petitioner's counsel, Houchlei admitted that when Houchlei spoke with him on April 1 in the hospital, Payne was uncooperative and did not know who shot him. (Tr. II, 594-95.)

At this point in the trial, the parties placed two stipulations on the record. (Tr. II, 608-09.) First, they stipulated that a witness from the Michigan State Police Crime Lab found that the 35 knotted clear plastic bags found in the upstairs bedroom closet contained 10.24 grams of crack cocaine. (*Id.*) Second, the parties stipulated that a witness from the Eaton County Sheriff's Department was prepared to testify that in his opinion and expertise in drug investigations, 35 individually-packaged rocks of crack cocaine is consistent with drug trafficking. (Tr. II, 609-10.)

Michigan State Police Department Crime Lab latent print examiner Andrew Wing testified that he examined a .45-caliber gun, magazine, fired cartridge, and live round for latent fingerprints.  (Tr. II, 616-17.)   He stated he found no identifiable latent prints on those items, or on a clear plastic baggie that had also been submitted to him.  (Tr. II, 617.)

Sergeant Reinhard Pope testified that he is a detective at the Michigan Police Department Forensic Science Lab, Firearms, Toolmarks and Explosives unit.  (Tr. II, 621.)  Pope testified that he examined a .45-caliber shell casing and .45-caliber Haskell handgun and determined that the casing was fired from the gun.  (Tr. II, 625-26.)

Kevin Hearld testified he was an Eaton County Detective on April 1, 1999.  (Trial Tr. vol. III, 640, 9/29/99, docket #15.)    He arrived at the scene of the shooting and interviewed witnesses.  (Tr. III, 640-41.)  He saw Petitioner detained in a Lansing police car.  (Tr. III, 641-42.)  Hearld heard Lieutenant Rojeski give Petitioner Miranda warnings.  (Tr. III, 642.)  He also heard Petitioner say he understood the warnings and agree to speak.  (Tr. III, 642.)  Petitioner told Hearld he was in the Cranbrook Apartment complex all day babysitting for Tanja McQuinn.  (Tr. III, 643-44.)  Petitioner also told Hearld he had gone to see another girl in the complex at some point that day, but could not remember her name or precisely where she lived.  (Tr. III, 643.)  Later on July 14, 1999, Hearld interviewed Petitioner with Detective Houchlei.  (Tr. III, 644.)  Petitioner was again advised of his Miranda rights; Petitioner again indicated he understood those rights and agreed to speak.  (*Id.*)  Petitioner told Hearld that he had an alibi witness in Inkster that would say Petitioner was there on April 1, 1999; Petitioner also told Hearld he did not recall speaking to Hearld at the scene on April 1.  (Tr. III, 644-45.)

- 12 -

On cross-examination by Petitioner's counsel, Hearld testified that on April 1, 1999, Petitioner was released because Stephanie Roth had not been able to identify him. (Tr. III, 647-49.) He stated he tried to speak with Tanja McQuinn, but she was uncooperative. (Tr. III, 650.) Hearld also testified Petitioner had told him on April 1, 1999 that he did not know anything about the shooting. (Tr. III, 651.) Hearld was the prosecution's last witness.

Lansing Police Officer Brian Rendon testified on behalf of Petitioner. (Tr. III, 662-63.) Rendon stated he responded to the scene of the shooting at about 4:30 p.m. on April 1, 1999. (Tr. III, 663.) Rendon further testified as follows. When he interviewed Diana Hawkins at the Cranbrook Apartments on April 1, she reported that only one black male had run into the apartment. (Tr. III, 664.)

On cross-examination, Rendon testified that he had also taken Robert Hawkins's statement; Robert likewise stated that two black men tried to get into the apartment, but only one gained entry. (Tr. III, 665.) Rendon further stated on cross that in the hectic period immediately following the shooting, neither Diana nor Robert gave all of the information they later provided. (Tr. III, 668.) Rendon testified that one of the officers present at the scene saw two men enter the apartment. (Tr. III, 669.) He stated that he saw a black male leave the apartment and be placed in custody in a patrol car, but that he would not be able to recognize that person. (Tr. III, 670.)

Petitioner's counsel asked that the jury be excused so that she could make legal arguments. (Tr. III, 672-73.) She told the court that Petitioner previously did not want to testify, but now wanted to take the stand. (Tr. III, 673.) Counsel asked that the court inquire whether Petitioner wanted to testify, and that the court advise Petitioner of his right to remain silent and that his silence could not be used against him. (Tr. III, 673.) The court did so; Petitioner's counsel pointed out for

- 13 -

the record that Petitioner was hesitating, but that the decision to testify was his to make. (Tr. III, 674.)

Petitioner testified on his own behalf. (Tr. III, 697, 700.) When his attorney asked Petitioner whether he had told Detective Hearld that he was in Inkster on April 1, 1999, Petitioner responded that he had told Hearld that he had a girlfriend in Inkster, but not that he was in Inkster on April 1. (Tr. III, 700.) Petitioner further testified as follows. He was in Lansing on April 1, 1999, and signed some papers at the scene of the shooting. (Tr. III, 700-01.) On April 1, he was babysitting his Aunt Tanja McQuinn's children at her Cranbrook apartment all day. (Tr. III, 701-03.) Contrary to Diana's testimony, Diana and Petitioner in fact knew each other; Diana, Petitioner, and Petitioner's girlfriend had hung out together on the night of March 31, 1999. (Tr. III, 703-04.) Petitioner and his girlfriend then stayed overnight at Petitioner's Aunt McQuinn's Cranbrook apartment on the night of March 31. (Tr. III, 704.) The only time Petitioner left his aunt's apartment on April 1, 1999 was sometime in the late afternoon, when he went to Diana Hawkins's sister's Cranbrook apartment to get Diana for his girlfriend. (Tr. III, 703, 705.) When Petitioner went to Diana's apartment, the screen door was open, Petitioner knocked, and Diana invited him in, asking, "What's up?" (Tr. III, 705.) Diana's brother was also present, getting ready to take out the garbage. (Tr. III, 706.) Diana told Petitioner to sit on the couch while she asked her brother if he would watch her kids while she went to McQuinn's apartment with Petitioner. (Tr. III, 706.) While Petitioner sat on the couch and Diana prepared to leave, Petitioner heard loud screaming outside that included someone yelling "stop." (Tr. III, 707.) Diana, who Petitioner knew as Michelle, went outside with Robert; Petitioner thought the commotion might be a family matter. (Tr. III, 708.) Soon thereafter, Petitioner went outside, where there were several police officers who told him to get down on the

- 14 -

ground.  (Tr. III, 708.)  The police handcuffed Petitioner at that time; but he was never arrested. (Tr. III, 708-09.)

Petitioner further testified on direct that at 7:00 p.m., he was released from police custody.  (Tr. III, 709.)  The police dropped Petitioner off at a hotel, but he did not stay there because his girlfriend from Inkster was still in Lansing visiting him.  (Tr. III, 710.)  Instead, he went back to his aunt's apartment.  (Tr. III, 711.)  Petitioner denied knowing Willard Payne; having seen Payne before; shooting Payne; being in the area of McDonald's with co-defendant Taylor; or knowing Taylor.  (Tr. III, 711.)

On cross-examination, Petitioner testified that Petitioner met Taylor for the first time through their attorneys in this case.  (Tr. III, 716.)  He further testified on cross as follows. Petitioner's street name is not "Chocolate"; no one has ever called him by that name.  (Tr. III, 716-17.)  Petitioner speculated that Diana may have referred to him as Chocolate because she could not remember his real name.  (Tr. III, 717.)  Petitioner was in Diana's apartment for a very short time. (Tr. III, 718.)  He never went to the second floor of the apartment.  (Tr. III, 720.)  When he was asked to get down on the ground, Petitioner told police at the scene to ask Diana what was going on because she knew who he was and could explain why he was at her apartment.  (Tr. III, 719, 722-23.) The officers asked him to wait in the back of a patrol car in the meantime.  (*Id.*)  Lieutenant Rojeski from the Sheriff's Department read him his Miranda rights; he waived those rights and agreed to speak with the officers because he "had nothing to hide."  (Tr. III, 720.)  Petitioner told the officers that he was in his aunt's Cranbrook apartment all day.  (Tr. III, 720, 722.)  He denied telling Detective Hearld that he left his aunt's Cranbrook apartment twice on April 1, 1999.  (Tr. III, 721.) Petitioner's girlfriend, Quiana Simmons, was near the police car where Petitioner sat, also trying to

talk to the detectives.  (Tr. III, 724-25.)  Petitioner had lived with his Aunt McQuinn in the Cranbrook apartments for a time.  (Tr. III, 736.)  He speculated that Diana and Robert Hawkins may have testified against him because they did not want responsibility for the gun and drugs found in their sister's apartment.  (Tr. III, 737.)

Petitioner further testified on cross that, contrary to the earlier testimony of Detectives Hearld and Houchlei, he did not tell them that he had not been in Lansing on April 1 when they arrested him on July 14, 1999.  (Tr. III, 729, 731-32, 734.)

Quiana Simmons testified that Petitioner was her boyfriend.  (Tr. III, 739.)  She further testified as follows.  Simmons lives in Inkster, but arrived in Lansing on March 31 and babysat Petitioner's Aunt Tanja's children at Tanja's Cranbrook apartment.  (Tr. III, 740-41.)  That night, Simmons met a woman named Michelle[1] who lived behind Tanja in the Cranbrook apartments.  (Tr. III, 742.)  Petitioner, Simmons, and Michelle spent an hour together at Tanja's house.  (Tr. III, 743.)  Simmons spent the night at Tanja's house in the same bed with Petitioner.  (Tr. III, 744.)  From 12:30 p.m. when they woke up to about 4:30 p.m. on April 1, they played video games; at 4:30 p.m. Simmons asked Petitioner to go get Michelle because Simmons liked her.  (Tr. III, 745-46.)  Petitioner never came back with Michelle.  (Tr. III, 746.)  An hour or two later, Simmons heard and saw police cars everywhere outside.  (Tr. III, 746-47.)  She walked outside and saw Petitioner in the back of a police car.  (Tr. III, 747-48.)  Simmons did not ask anyone why Petitioner was in the police car, and no one told her why he was there.  (*Id.*)

On cross-examination, Simmons testified that she did not know co-defendant Taylor, or anyone named "Corleone."  (Tr. III, 748.)  She further stated that she and Petitioner were living

---

[1] In her testimony, Quiana Simmons referred to Diana Michelle Hawkins as "Michelle."

together in Inkster, but on March 31, 1999, Petitioner had just started living at his Aunt Tanja's house as a live-in babysitter.  (Tr. III, 749-50.)  Simmons also stated on cross that she and Petitioner babysat for Tanja McQuinn on March 31, but did not babysit for her on April 1, because all of the adults were present that day, although Tanja may have been sleeping on April 1.  (Tr. III, 753-55.) Simmons stated she asked Petitioner to go and get Michelle for some female companionship because Tanja was smoking, which Simmons didn't like, and Simmons also didn't like Tanja's 14 year-old daughter.  (Tr. III, 756.)

On redirect examination, Simmons testified that as far as she knew, Tanja McQuinn was in her own bedroom on April 1, 1999, although Simmons did not see her.  (Tr. III, 757.)  She further stated on redirect that she did not like Tanja's 14 year-old daughter because the 14 year-old had given her wrong directions to Lansing once in the past.  (Tr. III, 757-58.)  Finally, Simmons testified that within the black culture, females often call males "Chocolate"; it is not a unique name for a black man.  (Tr. III, 757-58.)  Petitioner rested his case.  (Tr. III, 758.)

The prosecution called Detective Hearld as a rebuttal witness.  (Tr. III, 759.)  Hearld testified that at his July 14, 1999 interview with Petitioner, Petitioner stated he had an alibi witness that would attest to the fact that Petitioner was not in Lansing on April 1, 1999.  (Tr. III, 759-60.) In the July 14, 1999 interview, Petitioner denied talking to Hearld.  While speaking with officers on April 1, 1999, Petitioner did not say he knew Michelle/Diana Hawkins; nor did he say he was in her apartment to pick her up at Simmons' request.  (Tr. III, 761.)

On cross-examination by Petitioner's counsel, Hearld confirmed that Petitioner was not arrested for breaking and entering into Diana's apartment.  (Tr. III, 761.)  Hearld admitted that from the beginning, Petitioner denied he had done anything wrong.  (Tr. III, 762.)

- 17 -

The prosecution next called Detective Preuter as a rebuttal witness. (Tr. III, 763-64.) Preuter testified that he was also in the Lansing police car with Petitioner on April 1, 1999, and Petitioner did not at any time indicate he knew Diana/Michelle Hawkins or that he was in her sister's apartment to pick her up. (Tr. III, 765.)

At the conclusion of trial, the jury found Petitioner guilty of assault with intent to murder, possession of a firearm during the commission of felony, possession with intent to deliver less than fifty grams of cocaine, and carrying a concealed weapon. On November 3, 1999, Petitioner was sentenced to serve a term of 14 to 25 years; 2 years preceding and consecutive; 1 ½ to 20 years consecutive; and 1 to 5 years consecutive to count three and concurrent with count 1. (Sentencing Transcript, 45-46, 11/3/99, docket #16.)

## B.  Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His amended appeal brief, filed by counsel on October 19, 2000, raised the same four issues he raises in his application for habeas corpus relief. (Def.-Appellant's Am. Br. on Appeal, docket #17.) By unpublished opinion issued on April 2, 2002, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences. (4/2/02 Mich. Ct. App. Opinion (MCOA Op.), docket #17.) Petitioner filed a motion for reconsideration with the Court of Appeals, which the court denied on May 20, 2002. (5/20/02 MCOA Op., docket #17.)

On June 10, 2002, through counsel, Petitioner filed an application for leave to appeal to the Michigan Supreme Court. He raised the four claims raised before and rejected by the Michigan Court of Appeals, minus two of his specific insufficiency of the evidence claims. By order entered December 4, 2002, the Michigan Supreme Court denied his application for leave to appeal

- 18 -

because it was not persuaded that the questions presented should be reviewed.  (*See* 12/4/02 Mich. Ord., docket #18.)

Petitioner has altered one of his habeas grounds from its prior incarnation on direct appeal.  On appeal to both the court of appeals and the state supreme court, he argued that the 14 to 25-year sentence for assault and enhanced sentence for possession with intent to deliver were "disproportionate" and an abuse of sentencing discretion.  Def.-Appellant's Am. Br. on Appeal, 24-27, docket #17; Def.-Appellant's Application, 25-27, docket # 18.  In his habeas petition, he argues for the first time that the sentence on the assault and possession convictions violate the Eighth Amendment.  Pet. at 31-32.  The implications of these altered claims will be discussed in section IV, *infra*.

## <u>Standard of Review</u>

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 791 (2001), *cert. denied, Texas v. Penry*, No. 05-1167, 2006 WL 639150 (U.S. June 12, 2006).  The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court

of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  This Court also may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply.  *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be unreasonable "simply because that court concludes in its independent judgment that the relevant state-court decision

applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, the Court finds that Petitioner is not entitled to relief.

**Discussion**

### I. Ground I: Insufficient Evidence to Sustain Verdicts

Petitioner argues that there was insufficient evidence to convict him on the assault with intent to murder, possession with intent to deliver, and concealed weapon charges. Pet. at 11-20. His sufficiency claims regarding the assault and concealed weapon convictions are unexhausted. On direct appeal to the Michigan Supreme Court, Petitioner did not pursue his insufficiency argument as to the assault and concealed weapon convictions. (Def.-Appellant's Application, 28, docket #18.) In that court, he only argued insufficiency of the evidence on the possession with intent to deliver conviction. (*Id.*) The rule of exhaustion requires a petitioner to "fairly present" federal claims so that state courts have a "fair opportunity" to apply controlling legal principles to the facts bearing upon a petitioner's constitutional claim. *See Picard v. Connor*, 404 U.S. 270, 275-

77 (1971) (cited by *Duncan v. Henry*, 513 U.S. 364, 365 (1995) and *Anderson v. Harless*, 459 U.S. 4, 6 (1982)).  To fairly present a claim, it is not enough that all the facts necessary to support a federal claim were before the state court or that a somewhat similar state law claim was made.  *See Anderson*, 459 U.S. at 6; *Harris v. Rees*, 794 F.2d 1168, 1174 (6th Cir. 1986); *see also Duncan*, 513 U.S. at 366 (mere similarity of claims is insufficient to exhaust).  "If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution."  *Duncan*, 513 U.S. at 365-66.

Although Petitioner's insufficiency claims regarding the assault and concealed weapon charges are unexhausted, the Court may deny them as bases for habeas relief.  *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State").

A.      Assault with intent to murder

Petitioner argues that the trial evidence was insufficient to convict him for assault with intent to murder.  The Michigan Court of Appeals addressed this argument as follows:

> Both defendants challenge the sufficiency of the evidence in support of their convictions for assault with intent to commit murder.  In a criminal case, due process requires that a prosecutor introduce evidence sufficient to justify a trier of fact in concluding that the defendant is guilty beyond a reasonable doubt.  In reviewing the sufficiency of the evidence, this Court must view the evidence in the light most favorable to the prosecutor and determine whether a rational trier of fact could find that each essential element of the crime was proven beyond a reasonable doubt. *People v Johnson*, 460 Mich 720, 723; 597 NW2d 73 (1999).  This Court will not interfere with the jury's role of determining the weight of evidence or the credibility of witnesses. *People v Wolfe*, 440 Mich 508; 514-515; 489 NW2d 748, amended on

other grounds 441 Mich 1201 (1992); *People v Terry*, 224 Mich App 447, 452; 569 NW2d 641 (1997).

The elements of assault with intent to commit murder are (1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder. *People v Barclay*, 208 Mich App 670, 674; 528 NW2d 842 (1995). The specific intent to kill may be proven by inference from any facts in evidence, including the use of a dangerous weapon. *Barclay, supra*; *People v DeLisle*, 202 Mich App 658, 672; 509 NW2d 885 (1993).

[Petitioner] contends that the prosecution failed to present sufficient evidence of a specific intent to kill because the victim was wounded only in his buttocks. The victim testified at trial that [Petitioner] deliberately shot him in the hip while he turned to try to flee. [Petitioner] shot the victim from very close range, one witness estimated five feet, with a .45 caliber handgun. This evidence was sufficient to enable a rational jury to infer that [Petitioner] shot the victim with an intent to kill, but was unsuccessful either because he had poor aim or perhaps missed shooting the victim in a more vital area because the victim was moving. As this Court has observed, "[t]he intentional discharge of a firearm at someone within range is an assault. The usual result and purpose of such an assault is death." *People v Johnson*, 54 Mich App 303, 304; 220 NW2d 705 (1974).

(MCOA Op. at 2, docket #17.)

Petitioner argues that "the totality of the record dispels any specific intent to kill," and "[t]he record is void of any motive to want to hurt the Complainant much less kill him" Pet. at 15. Petitioner points out that no words were spoken to suggest an intent to kill; if he had truly wanted to kill the victim, he could have simply walked up to him and shot him; and that only a single shot was fired. Pet. at 15-16. He further argues that the Court of Appeals unreasonably applied clearly established U.S. Supreme Court precedent for reviewing the sufficiency of evidence at trial as set forth in *Jackson v. Virginia*, 443 U.S. 307, 309 (1979) (state prisoner is entitled to a determination of "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt") and *Moore v. Duckworth*, 443 U.S. 713 (1979) (same). Pet. at 14-16.

- 23 -

The *Jackson* standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. 443 U.S. at 319. Issues of credibility may not be reviewed by the habeas court under this standard. *Id.* at 326 (habeas court may not reject jurors' verdict simply because the evidence does not "rule out every hypothesis except that of guilt beyond a reasonable doubt"); *see also Herrera v. Collins*, 506 U.S. 390, 401-402 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

The Michigan Court of Appeals did not unreasonably apply the clearly established Supreme Court precedent of *Jackson* and *Moore* when it found that the trial evidence was "sufficient to enable a reasonable jury to infer that [Petitioner] shot the victim with an intent to kill, but was unsuccessful either because he had poor aim or . . . missed . . . a more vital area because the victim was moving." (MCOA Op. at 2.) In upholding Petitioner's assault with intent to murder conviction, the court of appeals pointed to evidence indicating Petitioner deliberately shot the victim in the hip as the victim turned to flee; shot the victim at very close range; and used a .45-caliber handgun from which an intent to kill may be inferred. *Id.* Viewed in a light most favorable to the prosecution, this evidence supports a rational trier of fact's finding that an intent to kill was present beyond a reasonable doubt. This Court may not declare the Michigan Court of Appeals decision "unreasonable" merely because it believes, in its own independent judgment, that it unreasonably applied clearly established Supreme Court precedent. *See Williams*, 529 U.S. at 411. Rather, the issue for this Court to determine is whether the court of appeals applied *Jackson* and *Moore* in a way

that is "objectively unreasonable." *See id.* at 410.  The Court finds that it did not.  I am also mindful

of the jury's responsibility to resolve conflicts in testimony, weigh evidence and draw inferences.

*See Jackson*, 443 U.S. at 324 n.16.

        B.    <u>Possession with intent to deliver cocaine</u>

        Petitioner claims that the evidence at trial was insufficient to convict him on the

possession with intent to deliver charge.  This claim is fully exhausted.  Regarding Petitioner's

possession with intent to deliver conviction, the Michigan Court of Appeals held as follows:

        Both defendants also argue that insufficient evidence supported their
conviction of possession with intent to deliver less than fifty grams of cocaine.  The
elements of possession with intent to deliver cocaine are that (1) the defendant
knowingly possessed a controlled substance, (2) the defendant intended to deliver
this substance to someone else, (3) the substance possessed was cocaine and the
defendant knew it was cocaine, and (4) the substance was in a mixture that weighed
less than 50 grams.  *People v Crawford*, 458 Mich 376, 389; 582 NW2d 785 (1998).
With regard to the element of possession, a person need not have actual physical
possession of a controlled substance to be found guilty of possessing it.  *Wolfe,
supra*, at 519-520.  Possession may be either actual or constructive, and may be joint
or exclusive.  *Id.* at 520.  The controlling question is whether the defendant had
dominion or control over the controlled substance.  *People v Konrad*, 449 Mich 263,
271; 536 NW2d 517 (1995).  An individual's presence at the place where drugs are
found is not itself sufficient to prove constructive possession; some additional link
between the defendant and the contraband must be shown.  However, circumstantial
evidence and reasonable inferences arising from the evidence may suffice to establish
possession.  *People v Fetterley*, 229 Mich App 511, 515; 583 NW2d 199 (1998).

        In this case, the occupant of the apartment, into which defendants fled
following the shooting and in which the cocaine subsequently was found, testified
that she saw [co-defendant] Taylor remove the plastic baggie that contained the
cocaine from his pocket and throw it at her, telling her to get rid of it.  She refused
and the baggie fell to the floor.  Taylor told [Petitioner] to pick it up, then pulled a
black handgun out of his waistband and handed it to [Petitioner].  Taylor directed
[Petitioner] to dispose of the drugs and the gun and [Petitioner] ran upstairs.  The
parties stipulated at trial that the plastic baggie contained thirty-five separately
"knotted clear plastic packages each containing off-white chunky material" weighing
in total 10.24 grams, that one randomly selected package tested positive for cocaine,
and that a police lieutenant was prepared to testify that in his experience the thirty-

five individually packaged rocks of cocaine were consistent with trafficking.  This evidence was sufficient to enable the jury to find that both defendants knowingly possessed the cocaine found in the apartment with the intent to deliver it.

(MCOA Op. at 3.)

Petitioner argues that evidence was insufficient on both the "possession" and "intent to deliver" elements.  He claims that the evidence at trial showed only that he picked the baggie of cocaine up off the floor at co-defendant Taylor's behest to hide or dispose of it, then ran upstairs with it; thus there was no evidence that he had the requisite intent to either possess or deliver it.  Pet. at 11-12, 19.  He contends that his possession of the drugs was "temporary and fleeting, not as an exercise of dominion and control."  Pet. at 19.

The decision of the Michigan Court of Appeals did not apply *Jackson* and *Moore* in a way that was "objectively unreasonable" when it found that a rational jury could have found the evidence sufficient to support a conviction for possession with intent to deliver cocaine.  *See Williams*, 529 U.S. at 410.  Coupled with other trial evidence, the testimony that Petitioner's possession of the cocaine in the apartment was "fleeting" at that particular moment, in that Taylor threw it at him and told him to get rid of it, does not dictate against a rational jury's finding that Petitioner possessed the drugs with an intent to deliver them at some time in the future.  *Jackson*, 443 U.S. at 319.

- 26 -

C.    <u>Carrying a concealed weapon</u>

Like his insufficiency argument on the assault conviction, Petitioner's insufficiency argument on the concealed weapon conviction is unexhausted because he failed to "fairly present" it to the Michigan Supreme Court. *See* Def.-Appellant's Application, 28, docket # 18. The Court may nevertheless deny this claim. *See* 28 U.S.C. § 2254(b)(2).

Petitioner argues the evidence was insufficient to convict him for carrying a concealed weapon. The Court of Appeals held as follows regarding that conviction:

> [Petitioner] further disputes that sufficient evidence supported his CCW conviction, which requires a showing that [Petitioner] carried a pistol concealed on or about his person. MCL 750.227(2). The victim testified that after defendants approached him and [Petitioner] initiated a physical confrontation, a handgun dropped to the ground from the area of [Petitioner's] waist during the struggle. This evidence amply supported the jury's rational determination beyond any reasonable doubt that [Petitioner] carried a concealed weapon. *People v Charron*, 54 Mich App 26, 29-30; 220 NW2d 216 (1974).

(MCOA Op. at 4.)

Petitioner contends that the evidence did not establish the "concealment" element. He contends that two witnesses' testimony that Petitioner pulled a gun from his waist area, and/or that a gun fell to the ground from Petitioner's waist area, showed only that those witnesses could not see the gun, though it was visible. Pet. at 20.

Again keeping in mind that this Court may not reject jurors' verdict simply because the evidence does not "rule out every hypothesis except that of guilt beyond a reasonable doubt," *Jackson*, 443 U.S. at 326, the Court finds that the decision of the Michigan Court of Appeals did not unreasonably apply *Jackson* and *Moore* in holding that a rational jury could have found the evidence sufficient to support a conviction for carrying a concealed weapon. As the court of appeals pointed

- 27 -

out in its decision, the victim testified at trial that a handgun dropped from Petitioner's waist area as the two "tussled." (Tr. I, 204-06, docket # 13.) This Court further notes that an observer of the struggle testified that while Petitioner and the victim were fighting, Petitioner reached into Petitioner's jacket, pulled a gun, and shot the victim. (Tr. II, 329-32, 336, docket # 14.) The Michigan Court of Appeals did not unreasonably apply the *Jackson* standard when it found that the victim's testimony alone "amply supported the jury's rational determination beyond any reasonable doubt that [Petitioner] carried a concealed weapon." (MCOA Op. at 4.)

## II.      Ground II: Improper Photographic Identification

In his habeas application, Petitioner argues that the photographic lineup conducted by the Lansing Police and admitted into evidence by the trial court violated his due process rights because a live lineup should have been conducted, and it was impermissibly suggestive. Pet. at 21-24.

The Michigan Court of Appeals addressed Petitioner's arguments regarding the identification evidence as follows:

> [Petitioner] contends that the trial court erred when it allowed evidence of a photographic identification made by the victim twenty-nine days after the shooting. A trial court's decision to admit identification evidence will not be reversed unless it is clearly erroneous. Clear error exists when the reviewing court is left with a definite and firm conviction that a mistake was made. *People v Kurylczyk,* 443 Mich 289, 303 (Griffin, J), 318 (Boyle, J); 505 NW2d 528 (1993); *People v Williams*, 244 Mich App 533, 537; 624 N2d 575 (2001).
>
> [Petitioner's] challenges to the use of a photographic lineup lack merit. A photographic lineup should not be used for identification "when a suspect is in custody or when he can be compelled by the state to appear at a corporeal lineup." *Kurylczyk, supra,* at 298 n 8; *People v Strand*, 213 Mich App 100, 104; 539 NW2d 739 (1995). A defendant is subject to legal compulsion to appear at a lineup when a warrant has been issued for his arrest. *People v Harrison*, 138 Mich App 74, 77; 359 NW2d 256 (1984). At the time of the photographic identification in this case,

> [Petitioner] was not in custody and no warrant had issued for his arrest. Accordingly, the photographic lineup was not per se improper. Furthermore, we have reviewed the circumstances surrounding the lineup to the extent possible from the existing record and conclude that the photographic lineup was not impermissibly suggestive. *People v Gray*, 457 Mich 107, 111; 577 NW2d 92 (1998); *Kurylczyk*, *supra* at 302.

(MCOA Op. at 7.)

Petitioner maintains that the photographic identification violated his due process rights because he was "readily available," and therefore a live lineup with his counsel present should have been conducted. Pet. at 22, 24. He further contends that the photographs of Petitioner were substantially different from the others in the array, which drew attention to him, thereby rendering the lineup unduly suggestive. Pet. at 21, 24. He argues that the Michigan Court of Appeals' conclusion on this issue was an unreasonable application of Supreme Court in *Neil v. Biggers*, 409 U.S. 188 (1972) (holding in habeas corpus proceeding that, while station-house showup to victim may have been suggestive, under the totality of the circumstances, the identification was reliable, and thus properly admitted) and *Stovall v. Denno*, 388 U.S. 293 (1967) (holding in habeas corpus proceeding that, under the totality of circumstances, showing suspect singly to ailing witness in the hospital was not so unnecessarily suggestive or conducive to mistaken identification that the petitioner was denied due process of law). Pet. at 21, 24.

This Court's main concern in assessing a petitioner's claim that an out-of-court identification violated his due process rights is the reliability of the evidence. *See Manson v. Brathwaite*, 432 U.S. 98, 114 (1977); *Wilson v. Mitchell*, 250 F.3d 388, 397 (6th Cir. 2001). In assessing reliability, the first inquiry is whether pre-identification encounters were unduly suggestive. *Wilson*, 250 F.3d at 397 (citing *Thigpen v. Cory*, 804 F.2d 893, 895 (6th Cir.1986)). If the identification procedures are found to be unduly suggestive, the "totality of the circumstances" are

reviewed to determine whether the identification was reliable despite the suggestiveness of the identification procedure. *Wilson*, 250 F.3d at 397. Factors to be considered in evaluating the likelihood of misidentification include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Wilson,* 250 F.3d at 397, citing *Neil,* 409 U.S. at 199-200.

The Michigan Court of Appeals did not unreasonably apply U.S. Supreme Court precedent when it affirmed the trial court's admission of the photo identification. As an initial matter, Petitioner argues that a live lineup, rather than a photographic lineup without counsel present, should have been conducted in this case. Pet. at 21-22. He cites no U.S. Supreme Court precedent in support of this assertion, *id*., nor could he. Because he fails to show the court of appeals' decision on this point violated clearly established U.S. Supreme Court precedent, this claim is not cognizable on a petition for habeas relief. *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 379.

As to whether the photographic identification of Petitioner was impermissibly suggestive or conducive to mistaken identification, the Michigan Court of Appeals directly followed and properly applied the "totality of the circumstances" analysis set forth in both *Manson* and *Neil*. (MCOA Op. at 7) ("we have reviewed the circumstances surrounding the lineup to the extent possible from the existing record and conclude that the photographic lineup was not impermissibly suggestive.")

- 30 -

### III.      Ground III: Ineffective Assistance of Counsel

In his third ground for habeas relief, Petitioner argues that he did not receive effective assistance of counsel because his trial attorney stipulated to an essential element of the possession with intent to deliver charge.  Pet. at 25-30.[2]  He contends that because he pleaded not guilty to that charge, he was entitled to a trial on the elements.  *Id*. at 25.  This claim is fully exhausted.[3]

The Michigan Court of Appeals held that Petitioner was not deprived of effective assistance of trial counsel by his attorney's stipulation to these matters because Petitioner presented an alibi defense at trial.  (MCOA Op. at 7, citing *People v Emerson (After Remand)*, 203 Mich App 345, 349; 512 NW2d 3 (1994)).[4]

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  The petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant, resulting in an unreliable or fundamentally unfair outcome.  466 U.S. at 687.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The defendant bears the burden of

---

[2] As set forth above, the parties stipulated at trial to a police lieutenant's testimony that, in his experience with drug investigations, the amount of the cocaine and the manner in which it was packaged was consistent with drug trafficking.  (Tr. III, 609-10, docket #14.)

[3] Although he did not list ineffective assistance of trial counsel in the issue headings of his application for leave to appeal in the Michigan Court of Appeals or the Michigan Supreme Court, Petitioner did argue ineffective assistance of trial counsel in the body of his briefs in support.  (*See* Def.-Appellant's Am. Br. on Appeal, 19-23, docket #17; Def.-Appellant's Application, 15-16, 24, docket #18.)  The court of appeals addressed this claim; this Court therefore will consider it exhausted.

[4] The Michigan Court of Appeals also disagreed with Petitioner's argument that the trial court erred in allowing the parties to stipulate to these matters.  The court held that the argument was waived by Petitioner's counsel's affirmative agreement to the admission of the stipulated evidence.  (MCOA Op. at 7, docket #17.)

overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The Court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691. A claim of ineffective assistance of counsel presents a mixed question of law and fact. Accordingly, the Court must apply the "unreasonable application" prong of § 2254(d)(1). *See Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003), *cert. denied*, 540 U.S. 1164 (2004). Where counsel's performance did not fall below an objective standard of reasonableness, the court need not reach the question of prejudice. *See United States v. Foreman*, 323 F.3d 498, 504 (6th Cir. 2003).

Here, the Michigan Court of Appeals did not unreasonably apply *Strickland* in assessing Petitioner's ineffective assistance claim. Trial counsel's stipulation to the police lieutenant's proffered testimony was not objectively unreasonable because it was not "outside the wide range of professionally competent assistance." At trial, Petitioner did not argue that he was at the scene of the shooting but did not possess cocaine with intent to deliver it. Rather, as the Court of Appeals points out, he argued that he was elsewhere at the time. (Tr. III, 703, 705, docket #15.) Therefore, his counsel's stipulation to the testimony that the quantity and packaging of the cocaine were consistent with drug trafficking was well within the range of professionally competent assistance. Because Petitioner's counsel's conduct was within an objective standard of

reasonableness, the Court need not reach the question of prejudice. *See Foreman*, 323 F.3d 498, 504.

## IV.    Ground 4: Disproportionate Sentence

As his fourth ground for habeas relief, Petitioner argues that his sentences on the assault with intent to murder and possession with intent to deliver convictions was "grossly disproportionate" to the offenses, and amount to cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. Pet. at 31-32.

Petitioner failed to "fairly present" his federal claim in the state courts. *See Whiting v. Burt*, 395 F.3d 602 (6th Cir. 2005) (citing *Baldwin v. Reese*, 541 U.S. 27 (2004); *Picard,* 404 U.S. at 275)). He did not argue that his sentence violated the Eighth Amendment on direct appeal to either the Michigan Court of Appeals or the Michigan Supreme Court. Instead, on direct appeal he argued only that his sentence was disproportionate under the analysis enunciated by the Michigan Supreme Court in *People v. Milbourn*, 461 N.W.2d. 1 (Mich. 1990). Def.-Appellant's Am. Br. on Appeal, 24-27, docket # 17; Def.-Appellant's Application, 25-27, docket # 18. Under *Milbourn*, the sentencing court must exercise its discretion within the bounds of Michigan's legislatively prescribed sentence range and pursuant to the intent of Michigan's legislative scheme of dispensing punishment according to the nature of the offense and the background of the offender. *Milbourn*, 461 N.W.2d at 9-10. It is plain that *Milbourn* was decided under state, not federal, principles. *See Lunsford v. Hofbauer*, No. 94-2128, 1995 WL 236677, at * 2 (6th Cir. Apr. 21, 1995); *Atkins v. Overton*, 843 F. Supp. 258, 260 (E.D. Mich. 1994). In addressing a claim that a sentence violated *Milbourn* proportionality, the Sixth Circuit stated that the issue was a matter of state law and that there was "no violation of a constitutional right because the United States Constitution contains no strict

proportionality guarantee." *Lunsford*, 1995 WL 236677, at *2 (citing *Harmelin v. Michigan*, 501 U.S. 957, 965 (1991) and *United States v. Hopper*, 941 F.2d 419, 422 (6th Cir. 1991)); *Terry v. Trippett*, No. 94-2077, 1995 WL 469424, at *1 (6th Cir. Aug. 7, 1995) (same).  Thus, Petitioner's proportionality claim is without merit.  *Id.*

Because Petitioner failed to present his Eighth Amendment claim before the Michigan appellate courts, the exhaustion requirement is not satisfied.  Nevertheless, the Court may address Petitioner's Eighth Amendment claim notwithstanding his failure to exhaust his state court remedies.  The United States Constitution does not require strict proportionality between a crime and its punishment.  *Harmelin,* 501 U.S. at 965; *United States v. Marks*, 209 F.3d 577, 583 (6th Cir. 2000).  "Consequently, only an extreme disparity between crime and sentence offends the Eighth Amendment."  *Marks*, 209 F.3d at 583.  A sentence that falls within the maximum penalty authorized by statute "generally does not constitute 'cruel and unusual punishment.'"  *Austin v. Jackson*, 213 F.3d 298, 302 (6th Cir.2000) (quoting *United States v. Organek*, 65 F.3d 60, 62 (6th Cir. 1995)).  Furthermore, "Federal courts will not engage in a proportionality analysis except in cases where the penalty imposed is death or life in prison without possibility of parole."  *United States v. Thomas*, 49 F.3d 253, 261 (6th Cir. 1995).  Petitioner was not sentenced to death or life in prison without the possibility of parole. Therefore, Petitioner's sentence does not run afoul of the Eighth Amendment's prohibition of cruel and unusual punishment. His Eighth Amendment claim is therefore both unexhausted and without merit.

**Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition

be denied.


Date:  August 24, 2006                     __/s/ Ellen S. Carmody_____
                                           ELLEN S. CARMODY
                                           United States Magistrate Judge



**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within ten days of
service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. C4. P. 72(b).  All objections and
responses to objections are governed by W.D. Mich. LC4R 72.3(b).  Failure to file timely objections
may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th
Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).